I thank the court. As stated, my name is Dana Wagner. I'm here on behalf of the United States, and with the court's leave, I would like to try to reserve three minutes of my time today for rebuttal. We're here because the district court committed two independent legal errors when it excluded the cross-examined former trial testimony of David Resignano. First, the court denied the government's motion for admission under Rule 804a-5 on the basis of an interpretation of Rule 804, which is inconsistent with the text of that statute, inconsistent with this Court's controlling precedents, and also would lead to some illogical and highly undesirable consequences. The second error was that it refused to consider sworn declarations submitted in support of the government's arguments under Rule 804a-4 on the basis that it found them to be inadmissible, and I'd like to address the first of those errors first. You're going to first address unavailability and the reasonable means? Correct, Your Honor. Rule 804 contains an explicit provision which addresses circumstances in which a party has a role in contributing to their own witnesses' unavailability, and it imposes an improper purpose test, a bad motivation test, for addressing such contributions to absence. To arrive at a different standard, a reasonableness review standard, the district court performed what we submit as a highly unnatural reading of the statute, where it took the other reasonable means language, which occurs in Section A-5, and which refers to alternatives to service of process for bringing a witness into court at the day of a hearing, and read and collapsed that into just reasonable means, and read it to modify or collapsed it into the subsequent independent provision, which addresses circumstances in which a party has contributed to unavailability. And we believe that's not a textually supportable move. It's certainly one that's not consistent with this Court's analysis in cases like Olufsen, and it's one that not only strips the provision which addresses these situations of independent meaning, but creates some illogical results, because either this reasonable means analysis, for instance, would have to apply to all five forms of unavailability, which is not textually sensible because it is buried in only one of those five sub-provisions, or it would apply only to the unavailability described in Rule 804a-5, which seems to be an arbitrary result, because that would mean a party could contribute unreasonably to one form or to some forms of unavailability, but not another. We don't think that result is one that there's any reason to think Congress intended. We think it's a bad reading. And we feel that Olufsen, as well as some other cases we've cited, support us in this. In Olufsen, you had negligently deported material witnesses whom this Court nonetheless found the district court had been correct to – for whom this Court found the district court had been correct to admit their prior statements because there had been no bad faith and because reasonable efforts to secure their presence post-deportation had failed. Now, if the district court were correct and an unreasonable deportation or a negligent deportation decision precluded a subsequent finding of unavailability under Rule 804a-5, that case could not have been analyzed or decided in the manner at which it was. And we also think there would be, as I indicated before, some very bad policy consequences if this type of reading were added. Alito, before you go on to the policy issues, I'm interested in your reading of Olufsen. I'm quoting here this. In that case, the government, in quotes, inadvertently deported the witness. Correct. And when, which is a case you didn't cite, the deportation occurred before criminal charges were filed against the defendant. Correct. Isn't there an important distinction in this case, though, that the government knew that Razzignano, I guess, is that the way you say it? I believe it's Razzignano. Razzignano, okay. Was an important prosecution witness. They affirmatively lifted the material witness warrant, failed to issue a subpoena, and yet let him leave on his bare assurances that he would return. Aren't those distinctive facts from Olufsen and Winn? Well, certainly, those are factual distinctions. In Olufsen, there were already criminal charges pending when the witnesses were released inadvertently, and we believe, you know, an inadvertent decision to release a material witness and allow their deportation could not be. But here, they intentionally let him go. Correct. And in Winn, there was an intentional release as well. Also, criminal charges filed until afterward. True. I mean, although I would submit that whether that was a reasonable decision or not was just something that didn't enter into the analysis of the Court in that case. Right. We can speculate about how that would have come out. In this case, I think the most closely analogous precedent, although it's not a precedent of this Court, is Euphratio Torres, which is a Tenth Circuit decision, where there were criminal charges filed, witnesses had been detained as material witnesses, and they were deposed and deported upon their assurances that they would return, and that was found to be reasonable. It's true, as the Court said, and it was also found that there was no bad faith, which we think is more important. It's true, as this Court indicated, that we did not issue a subpoena prior to the deportation. We did pave the way for the return through a number of efforts that the district court found were in good faith, including arranging for parole back into the country, arranging to pay for expenses. Our decision not to issue a subpoena was a considered one. We were aware that a subpoena would not be enforceable, and so even if there were a subpoena issued, we would still be, to a large extent, reliant upon the good faith of this witness to honor his commitment. And we felt that invoking compulsory process through an unenforceable subpoena would only serve to make that less likely, not more likely to assure his appearance. But this was a formerly convicted felon, a proven perjurer. How could you rely upon him? Well, I don't believe it's fair to say he was a proven perjurer, but I think that's somewhat besides the point. The Court is correct. Let's say he was not a model citizen. He had not been a model citizen prior to his incarceration on a roughly five-year sentence, which he had completed serving. Our analysis, and the Court found that this, you know, was truly formed in good faith, was based upon the cooperative relationship that we had developed with him prior to trial. He had cooperated with pretrial preparation despite the lack of any incentive to do so. He had testified. He had done everything we had asked of him. We believe that he had ample incentive to return, given that he had family here, he had been here for 20 years. He would not otherwise be able to return to the country. It did not seem implausible to us that he would take advantage of the opportunity to return here as a free person and have the opportunity to spend time here at the government's expense. That did not ultimately prove correct, or at least we don't know if it proved correct. We cannot determine from this side of the Atlantic Ocean the extent of his medical problems and whether these are genuine representations he's making us to this point or not. But certainly at the time, it seemed to us that this was a reasonable action for him to take. It's certainly plausible he would come back. And we, frankly, you know, believed him. And when his attorney came to us post-mistrial, after he had done everything we had asked of him and cooperated, requested his release, and we were able to arrange for that and receive her assurances and his assurances that he would come back, we did not think we had a basis to continue to detain him. And I believe if this Court looks to the material witness warrant statute, which is section 3144, that's borne out, that once witness testimony is preserved adequately, as this testimony certainly was, it appears there is little or no basis for continuing to detain a material witness. And as we said to the district court at the time, our feeling was that if we continued to detain him, this Court – I'm sorry, the district court would certainly have had rightfully chastised us for that. We simply thought he would return, and we didn't think it was fair to continue to maintain his incarceration. He was becoming sicker in custody. That was certainly a concern of ours. And we in good faith felt that if we released him, no party would be prejudiced. He would come back. I should point out also, I think, that the party that has been most severely affected by his inability or unwillingness to come back has been the government. He's our witness. He was actually our most compelling witness at trial. We would far prefer to have him here as a live witness than to present his testimony through a cold transcript that's not in our interest. And that is why we have endeavored, both before and after the district court issued its ruling on this case, and we've continued to endeavor through this week to maintain contact with him and convince him to come here as a live witness. That remains our preference. This is certainly not a case, as Mann was, which the defense is relying upon, and some of the other cases or possibilities we could think of, where the government is deliberately trying to remove a witness from the jurisdiction. That would certainly be inappropriate and impermissible. And there's no allegation that that's what happened in this case. I would like to suggest to the court that if the district court's reading were accurate and courts were to be able to second guess good faith decisions to release material witnesses in this manner, even when those witnesses' testimony had been fully preserved, that would not be a result that would be good for anyone. Because then, not only the government, but any party who had a material witness would essentially be forced to keep them detained as a matter of course. That's not something the government wants to do. I submit that it's not something the defense bar would want us to do. I could easily see getting an amicus brief in this case in support of the government's position, because the regime that's statutorily set up, and I'm referring to, again, 3144, also Rule 15a2, which discusses depositions, in which material witnesses may be released following preservation of their testimony is one that benefits everyone, and Congress has determined that that's the appropriate balancing of the Fifth Amendment rights of detained material witnesses against the Sixth Amendment rights of defendants to confront and cross-examine the witnesses against them. A right which we were aware had been fully vindicated in this case. There was thorough, extensive cross-examination of Mr. Resignano when he testified. I'd also point out on a related note that a necessary consequence of the defendant's position, as the defense candidly acknowledged below, I believe it's on page 182 of the record, is that even a videotaped deposition, which was a possibility that was discussed at one point, would not have been admissible if the witness were subsequently released and became unavailable. And we submit that that cannot be the correct result, because that's a scenario that's explicitly provided for in the Federal Code. In addition, we have the Rule 804, 804a4 issue. We submit that it was simply flatly incorrect and contradictory to Rule 104, and we submit that it's not the case that the defendant's position was unavailable in this case. And so I would like to reserve the rest of my time to rebut any arguments that come up subsequently. That's fine. You may reserve rebuttal time. Thank you, Your Honor. Mr. Cohen, we'll hear your argument next. Good morning, and may it please the Court. I'm Josh Cohen from the Federal Public Defender's Office. On behalf of the appellee in this matter, Yakov Yida, I'd like to begin this morning by reference to the actual text of the rule that we've been discussing, which is Rule 804a5. And what that rule says is that a witness is unavailable if he is absent from the hearing and the proponent of the statement is unable to procure his attendance by reasonable means. The rule imposes no limitations on the time period during which the proponent has to use those reasonable means to procure its witness's attendance. As such, the most natural reading of this rule is that it requires consideration of everything that the proponent has done to try to procure that witness's attendance. Here, that would start with the government's decision initially before the first trial to detain the witness. Throughout the period of pretrial preparation and throughout the trial itself. It would include consideration of the government's decision to release the witness with the full knowledge and actual intent that that witness then be allowed to leave the country and go back to Israel. And it includes consideration of what the government did after the witness left the country in order to try to bring him back. What the district court did in this case, and what I would submit is a completely natural thing to do under the law itself and also under the cases interpreting it, is consider all of those factors. And what the district court found to be unreasonable was the decision to let the witness go on his promise to reappear, which is very, very different from saying the government was reasonable in trying to bring back a witness who, through no fault of its own, had left the country. I have made this point, I think, quite clear in my briefs, but I can't emphasize enough that there is no support, there are no cases that take the government's position in this case or that adopt the limitation that the government is trying to read into the rule. The – there really aren't very many cases, and I don't think it's surprising that there aren't very many cases that deal with a situation like this where the government makes a decision to let a witness that it knows to be material leave.  The rule, and I'd like to look at the rule as well. If you – right after A-5, it states, A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or, and I note absence, is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying. If we apply the construction of the rule that you're propounding here or asking us to adopt, wouldn't that render the improper purpose standard kind of superfluous? I don't think so, Your Honor. I don't think so at all. I think that the way the rule is structured, there are two separate considerations that affect the unavailability analysis. A witness may be unavailable if he satisfies the requirement in 804-A-5, and yet that finding of unavailability would be precluded, would be barred, would be reversed, so to speak, if it could be shown that the reason for the witness's being unavailable under 804-A-5 or any of the other clauses was due to the wrongdoing or the improper purpose of the claimant. So from your perspective, it's a two-pronged test, reasonableness for the entire time framework and lack of wrongdoing. Correct, Your Honor. Correct. And I think that the lack of wrongdoing applies no matter which of the 804-A-12345 happens to be the basis for the finding of unavailability to begin with. And I think that the government's urging of a rule to the contrary is not only support unsupported by the text of the rule itself, but also by the case law. Mr. Cohn, in your argument, you said there's no authority supporting the government's position, and I'll go look at the briefs again, but I was under the impression that Judge Breyer had relied on extra-circuit authority. I think that's right, Your Honor. He did. He relied on extra-circuit authority to find that in a situation like this, it is proper to consider everything that the government did. So if you say there's no authority, do you mean in the Ninth Circuit or do you – are you saying that the extra-circuit authority is not really – doesn't have any force? Let me be very clear. I'm saying that there's no authority in any circuit for the position that the government is urging, for the limitation that the government is trying to read into this rule, whereby it's never appropriate to consider the reasons that the defendant left the country in the reasonable means analysis. I believe that there is authority, and I concede that it's extra-circuit authority, but there is authority for the proposition that it's proper to consider the reasons that somebody left in a situation akin to the one we have here. I think the most analogous authority is the Mann case from the First Circuit. There, the government had a witness who happened to be a 17-year-old Australian woman. It took that woman's deposition. It then gave her back her passport. It gave her back her plane ticket. And it asked her, will you come back if we need you to, and she said yes. And at that point, she was removed from the country. What the First Circuit said is the steps that the government take to procure that witness's attendance were unreasonable because the duty to use reasonable means to procure the witness includes the duty to keep that witness or to use reasonable means to keep that witness from becoming absent. That's the kind of situation that we have right here, and so when I say there's no authority, I mean there's no authority for the government's position. You know, one of my weaknesses, and you try and recognize your weaknesses so that you will be a better person, is that I am too literal. And I'm looking at the construct here of this whole scheme, and this 804A5 is one of 29 exceptions in the Federal Rules of Evidence to the hearsay rule. And they are detailed in their number, and they are detailed in their text, and this particular rule that we're examining talks about the unavailability of the witness and the reasonableness of efforts to secure the person's attendance. And what it doesn't say is that it doesn't say anything about how it was that the witness became unavailable. And I guess the difficulty that I have with your point of view is that the language that you articulate or espouse simply isn't in the rule, in the scheme of rules, that is unbelievably precise. And we see these cases that talk about good faith and negligence and reasonableness and all these subjective terms. Is it arguable, sir, that the reason that this is all current, this language that we find, is because jurisprudentially we're trying to push a square peg into a round hole. The language isn't there. And perhaps the better thing to do would be to amend the rule, to get some language with respect to why the witness left in the first place or became unavailable. I understand Your Honor's point. I think that the language actually is there, and it all has to do with at what point we're evaluating the efforts that the government has taken. If we were to go back, for instance, Your Honor, to the first trial here, the question would have been what had the government done at the point of the first trial in order to procure the witness's attendance. Well, the government had slapped the witness with the material witness detainer to make sure that the witness didn't leave. Fast forward to the second trial. We have the same issues on the table. We have the same witnesses that the government wants to call. What has it done to procure the witness's attendance at that trial? Well, it has undone what it did at the initial trial, which was to detain him, and without consultation with the district court, without consultation with the defense, without doing so much as subpoenaing the witness or taking any of several much less restrictive or much less drastic measures than releasing him and letting him go home. The government has simply let him go. And so I don't think that there's an absence of language in the rule. I think that the question is temporal. And here, when we have steps that the government took originally to secure the witness's from that point up until the retrial. And so it's considering everything that the government did as part of its efforts to procure the witness's attendance. In terms of language that isn't there, that's a pretty good answer. Well, I thank you, Your Honor. Counsel, Mr. Wagner raised a point that I'd like you to address. He mentioned that had the witness been detained much longer, particularly given his alleged medical condition, that he might have had a Fifth Amendment claim. How would you, as defense counsel, balance the Fifth Amendment interests of a Fifth Amendment, I mean, of a material witness such as this gentleman versus the Sixth Amendment claims that your client has? How should we weigh that? Well, Your Honor, I think that there are a couple of answers to that question. One of them is one that the district court addressed at least implicitly, which was if this is the concern that the government had, there are ways that we can deal with it that are much less restrictive than what the government did. First and foremost, let's have the retrial in a very speedy fashion. Let's at least talk about how quickly we should have the retrial so that this witness doesn't have to be detained any longer than necessary. Moreover, let's talk about other less restrictive alternatives. Let's get this person back out into the community. Let's put him with an ankle bracelet. Let's let him live freely in Los Angeles like he did for 20 years, but let's just not give him his passport back so that he can't leave. Now we've taken care of the witness's rights not to be detained unfairly, but we haven't created this risk that he's not going to be absent. There's also case law, Your Honor, for the proposition that when a witness is critical to the government's case or when there's real questions about his credibility such that the defendant has a very strong Sixth Amendment right to confront him, then the appropriate thing to do may be to detain him. I believe, Your Honor, that that is the Peña-Gutierrez case. I've certainly cited it in my brief, and that is exactly what it says. When there's a serious risk that justice would be compromised because the defendant won't have the opportunity to cross-examine this witness at trial in front of the jury, it may actually be appropriate to detain him. And I think that that is something that has perhaps been lost in the government's position is, as long as we have acted in good faith and our motives are pure, the consequences of our unreasonable actions must be borne by the defendant. And the government says today, well, actually, we're the ones, we, the government, are the ones who've suffered as a result of the removal of this witness because we needed him. But the government doesn't have the Sixth Amendment right to confront witnesses against it. That is the defendant's right. And so when the government says, as long as we act in good faith, it's all okay, it's forcing the defendant to bear the brunt of its unreasonable decision to deport somebody. And because there is a Sixth Amendment right which includes not only the right to confront the person in the sense of cross-examining him, but also to have a jury examine his demeanor and his credibility and to make judgments about whether he's to be believed, that's not a right that can be as lightly disregarded as I would submit the government is suggesting to you here today. Mr. Cohen, a question for you. It's sort of a procedural one. Mr. Wagner suggested, and I don't know what's in the prior record. It's been a while since I looked at the briefs, but that there could be amicus briefs on this subject. So my question is this. First of all, factually, am I right? We haven't received, have we received any amicus briefs to date? I don't believe so, Your Honor. So if one were to call on the, you know, some groups that have a vested interest in the subject, like a National Defenders Organization or Association of Prosecutors, are we certain what, we really don't know what position might be taken in balancing the Sixth Amendment rights of the defendant versus the rights of the material witness to get out of there. So I just wonder, are you, what's your view on whether we should call for amicus briefing? We have had cases that I've been in where after a challenging issue was presented, we reopened the briefing to permit amicus briefs to be, to be filed. Obviously, Your Honor, if the Court believes that amicus briefing would be of assistance to it, I'm not about to say that that's inappropriate. I do think I need to point out to the Court that Mr. Yida remains in custody. He was prepared to go to trial. This all arose on the eve of the retrial. And so what we did immediately upon receiving notice of the government's appeal was to seek expedited review from this Court. And I think that that's perhaps germane to the question that you're asking. With organizations like the Defenders Organization, how long does it normally take to get an amicus brief out of them if they want to participate? They are very responsive, Your Honor. They're very responsive. Okay. Thank you. The only other issue that I do want to point out, because I don't think it's addressed to any great extent in the briefs, is the suggestion that a subpoena is a futile idea in a situation like this. The government says we didn't give a subpoena to Mr. Resignano because we knew he was going to go to Israel and it wouldn't have had any power at that point. What the government is really saying is once Mr. Resignano was in Israel, we wouldn't have the power to enforce his failure to comply with that subpoena so long as he stayed in Israel. Well, that's certainly true. But had the government issued a subpoena to Mr. Resignano while he was here in the United States, it would have been legally effective. The Mann case addresses that situation. The First Circuit says the government should have served this material witness with a warrant, even with a – excuse me – with a subpoena, even though they knew he was going to leave the country, because it would have had legal effect. And when you're talking about someone like Mr. Resignano who has strong ties to the government, there might be something to having a subpoena issued to him such that he has a legal obligation to return to the United States to honor it, and the knowledge that if he doesn't do so, there could be contempt charges waiting for him back home. As it is, having taken no such steps, there are really no consequences to Mr. Resignano's decision not to come back to the country, and we're in a situation where we are now, where by virtue of the government's failure to take those steps, we have a defendant's Sixth Amendment rights that are potentially at issue. If there are no other questions, I would submit. Roberts. Thank you, Mr. Cohn. Mr. Wagner, I'm trying to remember if you reserved a few minutes. Yes. Wagner. I believe I ended up with eight minutes, which I don't think I'll take up all of, Your Honor. Roberts. Oh, feel free. Wagner. Thank you. Roberts. What's there for? Wagner. I just have a few points I'd like to try to make briefly, if I can. First, to pick up on what I believe Judge Smith and Judge Covello were saying earlier in the defense presentation, the temporal focus of all five definitions of unavailability, as we stated in our briefs, is at or around the time of the hearing. That's when unavailability matters. And to read the other reasonable means language as expansively as the defense is trying to urge this Court to do would certainly render the final clause, which addresses when a party's actions have contributed to unavailability, somewhat superfluous. And I would suggest to Your Honor that that is the language that is there addressing the only language in the statute that talks about why a witness may have become available, and that pending any change in the statute, that is the language that should be looked to in regulating parties' actions in that regard. The defense is correct in that there is a two-prong analysis, but the two-prong analysis is, is this witness available or not? Here, as we stand here, is there or are they absent, and can a subpoena or other reasonable steps get them here? And then if the answer to that question is yes, well, was there any bad faith misconduct, any purposeful contribution to that by the proponent, and if that answer is no, as it is here, the testimony should come in. The second point I'd like to address is that the defense has submitted, as they just stated, that there's no authority in any circuit supporting the government's position. We respectfully differ with that. We've pointed to cases, Licavoli in the Sixth Circuit, Saggio in the Second Circuit, Mathis in the Fourth Circuit, all of which support our position that unless the level of contribution to a witness's unavailability rises to the level of bad faith misconduct, it's not a bar to the admission of the testimony under Rule 804. And certainly we feel that Wynn and Olison in this circuit are consistent with that, and a contrary holding would be inconsistent with the manner in which this Court has analyzed the evidentiary rule we're talking about. And I would – I would submit that in response to those arguments, the defense has only offered this Court two nonbinding authorities, which are the district court case of Wilson and the First Circuit case of Mann, which, when examined  should be admitted. In Mann, there was bad faith misconduct, which we certainly don't have here. In Wilson, the district court suggested that had the government so much as told the deported witnesses of – the deported witness, I'm sorry, of his obligation to return if needed for retrial and offered to pay expenses, that would be sufficient. Again, here we took those steps and more. I'd also like to briefly address the discussion of Amicus briefing that was just had. I don't feel that would be appropriate or I should say necessary in this case, although it's of course within the discretion of this Court, to call for that. And the reason it would be unnecessary is that Congress has already determined the appropriate balancing of Fifth Amendment and Sixth Amendment rights in this context in enacting the material witness warrant statute. And to exemplify that, I'd offer the thought experiment. If there had been no trial in this case, if we were still pending the first trial and Resignano's attorney had come to us and said, look, my client has been in custody for five months on this warrant, his health is deteriorating, I'm moving to preserve his testimony through a deposition and then he will be released, the statute provides for that, that would have occurred, and once the testimony had been so preserved, it would have been mandated by the material witness warrant statute that we release him. Now, this situation is highly analogous to that. In fact, we had the testimony preserved in a superior form. It was cross-examined trial testimony taken in an identical criminal proceeding, and we did do more than simply release him. We released him while trying to pave the way for his return. Finally, a few quick points. The defense has suggested that we could have pushed for the retrial to occur in as speedy fashion as possible. It was very clear following the mistrial, and I can point to record citations for this, that any retrial would occur at least several months in the future. As the defense stated on, I believe, page 122 of the record, at the April status conference, the defendant wanted to pursue a civil challenge to his extradition from Mexico into D.C. courts before any retrial. We certainly didn't know how long that was going to take. The defense also, as we knew from communications and as discussed at the June 7th hearing, wanted to bring at least one witness into the country from Mexico for a retrial, and that witness had her own immigration problems that would have to be resolved. Both sides wanted to pursue plea negotiations. One of the defense counsels had a Supreme Court argument coming up. There were numerous reasons, though we had no reason to think that any retrial would occur in the near future and any retrial date would be something of a moving target. The defense has suggested here and in their brief that Mr. Reginiano could have been released into the community as he had been when he had lived for 20 years in L.A. before his conviction. That was not possible given the existence of the deportation order. As is discussed in Sejo, once there is a deportation order in place, that individual has to be deported by the Department of Homeland Security forthwith unless they are being maintained in custody as material witness. And finally, I would just submit that to the extent the defense has raised Confrontation Clause concerns, those are certainly not concerns the government would dismiss lightly and the government would not have taken the actions it did in this case had the confrontation right not been fully vindicated by full in-court cross-examination during the initial trial. And as Ohio v. Roberts states, prior cross-exam and trial testimony is generally immune from Confrontation Clause attack, and that's why. So in closing, I would simply submit that the district court's legal interpretation was contrary to the text of the statute. We feel it would have very negative policy consequences and is contrary to the presence of the circuit. We strongly urge the court that it should be reversed. Okay, thank you. By the way, you mentioned Roberts. Yes. Would you say it's also consistent with Crawford? Yes, absolutely. Post cross-exam and trial testimony has been routinely admitted throughout the country in the wake of Crawford. And nothing in Crawford disposed of reliability analysis as a substitute for cross-examination, but did not affect the analysis in a case like this where the cross-examination right had been vindicated. Okay, thanks. Thank you. Compliments to both of you gentlemen for a fine argument. Thank you, Your Honor. Thank you both. The case shall be submitted. Court will recess.
judges: Gould, Smith, Covello